**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

---

KINDRA O'BRYANT, BRIAN
FLANDERS, and ARTIE PEOPLES,        1:17-cv-07752-NLH-AMD

       Plaintiffs,        **OPINION**

v.

THE NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY, et al.,

       Defendants.

---

**APPEARANCES:**

KINDRA O'BRYANT
1320 CHASE STREET
CAMDEN, NJ 08104

BRIAN FLANDERS
1320 CHASE STREET
CAMDEN, NJ 08104

ARTIE PEOPLES
1214 N. 33RD STREET
CAMDEN, NJ 08105

    *Plaintiffs appearing <u>pro se</u>*[1]

---

[1] It has been represented to the Court that even though O'Bryant and Flanders resided together when this matter was filed, they no longer live in the same home. It appears from the certificate of service filed by the state defendants that O'Bryant now resides with her father, Peoples, and Flanders resides in Wildwood, New Jersey. (Docket No. 57-1 at 2.) O'Bryant and Flanders have failed to update their addresses with the Court. <u>See</u> L. Civ. R. 10.1(a) (directing that litigants have an affirmative duty to inform the Court of their current address and to inform the Court of any changes within seven days, and if a litigant fails to do so, the complaint is subject to being struck by the Clerk).

BRETT JOSEPH HAROLDSON
NEW JERSEY DEPARTMENT OF LAW AND PUBLIC SAFETY
DIVISION OF LAW
25 MARKET ST
PO BOX 116
TRENTON, NJ 08625

    *On behalf of the New Jersey state defendants*[2]

HOWARD LANE GOLDBERG
KRISTA SCHMID
OFFICE OF CAMDEN COUNTY COUNSEL
520 MARKET STREET
COURTHOUSE, 14TH FLOOR
CAMDEN, NJ 08102

    *On behalf of the Camden County Sheriff defendants*[3]

---

[2] The State Defendants are:

    1. The New Jersey Division of Child Protection & Permanency ("DCPP") is "New Jersey's child protection and child welfare agency within [the Department of Children and Families ("DCF")." (Plaintiffs' Complaint ¶ 4). (DCF is a "principal department" that is "established in the Executive Branch of the State Government." N.J.S.A 9:3A-3.)
    2. Allison Blake was at all times relevant the Commissioner of DCF. (Plaintiffs' Complaint ¶ 6).
    3. Lisa Von Pier was, at all times relevant, the Assistant Commissioner in charge of DCPP (i/p/a the "Director" of DCPP). (Id. ¶ 5).
    4. Lisa Capone is a supervisor at DCPP. (Id. ¶¶ 7, 32, 80, 123, 163).
    5. Conchita Varga is an employee of DCPP. (Id. ¶ 8).
    6. Bryant Rolls is an employee of DCPP. (Id. ¶ 9).
    7. Alicia Ash is an employee of DCPP. (Id. ¶ 12).
    8. Jonathon Garrett is an employee of DCPP. (Id. ¶ 13).

[3] The Camden County Sheriff's Department is not named as a defendant.  The named defendants are Camden County Sheriff Gilbert "Whip" Wilson, Sheriff Deputy T. Nichols, and Sheriff Deputy Gurkin.

**HILLMAN**, District Judge

Plaintiff Kindra O'Bryant is a mother of three children, Plaintiff Brian Flanders is the father of the youngest of O'Bryant's children, and Plaintiff Artie Peoples is O'Bryant's father and the grandfather of all three children.  This matter concerns claims by Plaintiffs arising from a state court child welfare case and the temporary removal of O'Bryant's children from her custody.  Plaintiffs' complaint was dismissed on September 6, 2018 (Docket No. 44), but on appeal the U.S. Court of Appeals for the Third Circuit reversed the dismissal and remanded the action because the bases for dismissal - the domestic relations exception to subject matter jurisdiction and the <u>Younger</u> abstention doctrine - were not properly applied (Docket No. 56).[4]  Since that time, the state court custody case has concluded, the children have reunited with O'Bryant, and O'Bryant is no longer in a relationship with Flanders.

Presently before the Court is the renewed motion by the state defendants to dismiss Plaintiffs' complaint.[5]  Plaintiffs filed a 247-paragraph complaint which details the alleged circumstances regarding the temporary removal of Plaintiffs' children in August

---

[4] The action was reassigned to this Court on June 16, 2020.

[5] The Camden County Sheriff defendants have not renewed their motion to dismiss.

2017, and which asserts various claims for constitutional violations against the people involved in the temporary removal of O'Bryant's children from her care.

For the reasons expressed below, Plaintiffs' complaint against the state defendants will be dismissed in its entirety because the state defendants are entitled to qualified immunity.

## BACKGROUND

As stated, Plaintiffs' complaint is 247 paragraphs. The Court restates a summary of the facts supporting Plaintiffs' claims from the prior Opinion, and provides an update on the procedural history of the state court case.

According to the complaint, on June 6, 2017, New Jersey Division of Child Protection & Permanency ("DCPP") received a telephone call from the Early Childhood Development Center School indicating that when Flanders dropped off O'Bryant's two children at school that morning, he appeared to be "upset and agitated." (Compl. ¶¶ 25, 36.) Upon further investigation, DCPP discovered that Flanders had an "endangering the welfare of child charge, weapons charges, aggravated assault on a police officer charge, [and] warrants for his arrest." (Id. ¶ 132.)

Also on June 6, 2017, O'Bryant was hospitalized in connection with an incident of self-mutilation ("cutting") and attempted suicide due to severe depression. (Id. ¶¶ 26, 43-46, 51.) O'Bryant was pregnant with her and Flanders' child at the time.

4

(Id. ¶¶ 26, 75.)  Sometime before O'Bryant was discharged from the hospital on June 7, 2017, she signed a Family Agreement, wherein O'Bryant agreed that Flanders would only be permitted around the children after completing a twelve-week parenting and domestic violence program.  (Id. ¶¶ 12, 54-61, 87-89.)  Thereafter, Defendant Alicia Ash, an employee of DCPP, and another caseworker toured O'Bryant's home and "noticed that the house had an insect pest problem (roaches, bed bugs)[,] the stove was broke and the house was in need of repairs."  (Id. ¶ 67.)

On August 15, 2017, O'Bryant gave birth to K.F. at Cooper Hospital.  (Id. ¶ 75, 122.)  The following day, DCPP caseworkers arrived at the hospital to discuss with O'Bryant the Family Agreement she had previously signed. (Id. ¶¶ 76-78, 81-120.) While at the hospital, one of the DCPP caseworkers, Defendant Conchita Varga, asked to interview O'Bryant's two older children. (Id. ¶ 124.)  Peoples, the children's grandfather, refused to permit Vargas to interview the children and attempted to leave the hospital with them.  (Id. ¶ 125.)  In response, the complaint alleges that Defendant Varga summoned Defendant T. Nichols, a Deputy Sheriff with the Camden County Sheriff, who escorted Peoples and Flanders across the street from the hospital to the DCPP office, where it was decided that the children should remain in DCPP custody.  (Id. ¶¶ 126, 138, 141-42, 147.)  Flanders was subsequently arrested by Defendant T. Nichols two hours later.

(Id. ¶¶ 144-45.)  After K.F. was cleared for release by the hospital, she was removed from O'Bryant's custody by DCPP.  (Id. ¶ 159.)

On August 18, 2017, DCPP filed a Verified Complaint for Child Abuse – Neglect against O'Bryant and Flanders in the Superior Court of New Jersey Chancery Division, Family Part, Camden County, Docket No. FN-04- NJS:17144081.  (See Docket Item 27 at 8-17.) Because O'Bryant could not attend a hearing to be held that day, the proceedings in the Superior Court were postponed until October 5, 2017.  (Compl. ¶¶ 171, 177.)  On October 2, 2017, three days before that hearing was to be held, Plaintiffs filed this Complaint in federal court seeking $10,000,000 in compensatory damages and $50,000,000 in punitive damages.

The Court subsequently asked for an update as to the status of the state court proceedings.  (Docket No. 40.)  Through those proceedings, DCPP "has been working actively with the Plaintiffs to achieve reunification . . . [with] hopes that reunification will occur in approximately six months," and "as part of this process, Plaintiffs have been visiting the children almost daily." (Docket No. 41.)

On September 6, 2018, Plaintiffs' complaint was dismissed. On June 16, 2020, the Third Circuit reversed in part, finding the domestic relations exception inapplicable, and finding that the court did not undertake the proper analysis for a Younger

6

abstention.  (Docket No. 56-2.)  The Third Circuit affirmed the dismissal of all claims for monetary damages against DCPP and the individual state defendants in their official capacities on the grounds of Eleventh Amendment sovereign immunity.  (Id. at 56-2 at 7).  Since the appeal, DCPP has advised that the state court proceedings have since concluded and the children have been reunited with O'Bryant, who is no longer in a relationship with Flanders.  (Docket No. 57-2 at 12.)

Plaintiffs have asserted claims that all the defendants, in various groupings, have violated their "First, Fourth, Fifth and Fourteenth Amendment rights . . . to due process, compulsory process, equal protection, [ ] freedom from interference with their fundamental rights as parents without due process." Plaintiffs have brought their claims against defendants pursuant to 42 U.S.C. § 1983 and 42 U.S.C. § 1985(c).

The state defendants have moved to dismiss Plaintiffs' claims on numerous bases.  Plaintiffs' opposition to Defendants' renewed motion to dismiss clarifies that their primary concerns are that the DCPP, though its caseworkers and other employees, should have shown more empathy to O'Bryant, it was illogical that they had concerns about Flanders being around her children while he was permitted to care for his biological children, and this is a systemic problem perpetrated against minorities that could be prevented with more oversight.  (Docket No. 59.)

7

## DISCUSSION

### A.   Subject matter jurisdiction

Because Plaintiffs have brought claims pursuant to 42 U.S.C. § 1983 and § 1985 for alleged violations of their constitutional rights, this Court has jurisdiction of this matter pursuant to 28 U.S.C. §§ 1331 and 1343.

### B.   Analysis

#### 1.   *Plaintiffs' claims against the DCPP defendants*

Section 1983 provides in pertinent part, "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."  "By its terms, of course, [§ 1983] creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere."  City of Oklahoma City v. Tuttle, 471 U.S. 808, 816 (1985).

"To establish a claim under 42 U.S.C. § 1983, [a plaintiff] must demonstrate a violation of a right secured by the Constitution and the laws of the United States [and] that the alleged deprivation was committed by a person acting under color

8

of state law." Moore v. Tartler, 986 F.2d 682, 685 (3d Cir.

1993).  For claims asserted against persons acting under the color

of state law, such as the defendants here,[6] the qualified immunity

doctrine governs the analysis.  "Qualified immunity shields

government officials from civil damages liability unless the

official violated a statutory or constitutional right that was

clearly established at the time of the challenged conduct."

Reichle v. Howards, 566 U.S. 658, 664 (2012).  "When properly

applied, it protects 'all but the plainly incompetent or those who

knowingly violate the law.'"  Ashcroft v. al-Kidd, 563 U.S. 731,

735 (2011) (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

    To overcome a defendant's qualified immunity shield, a

plaintiff must plead facts showing (1) that the official violated

a statutory or constitutional right, and (2) that the right was

"clearly established" at the time of the challenged conduct.  al-

Kidd, 563 U.S. at 735 (citation omitted).  Lower courts have

discretion to decide which of the two prongs of qualified immunity

analysis to tackle first.  Id. (citing Pearson v. Callahan, 555

U.S. 223, 236 (2009)).

---

[6] Constitutional claims may only be asserted against a "person" and
not the State.  Will v. Michigan Dept. of State Police, 491 U.S.
58, 71 (1989) (holding that neither a State nor its officials
acting in their official capacities are "persons" under § 1983).
Plaintiffs have sued the defendants in their individual
capacities.  Previously, Plaintiffs' claims against Defendants in
their official capacities were dismissed.

The state defendants argue, among other things, that Plaintiffs have not pleaded facts on either of two prongs sufficient to overcome the protections of qualified immunity. This Court agrees and focuses only on the second prong.

To explain why the state defendants are shielded by qualified immunity and Plaintiffs' complaint is deficient to overcome that protection, the Court relies on a Third Circuit case, which mirrors Plaintiffs' claims here and is directly on point. In Mammaro v. New Jersey Div. of Child Protection and Permanency, 814 F.3d 164, 166-67 (3d Cir. 2016), the plaintiff, Michelle Mammaro, who was the mother of one and a half year old D.M., came to the attention of DCPP when she was taken to a hospital for injuries inflicted by her husband, Damon. D.M. was not harmed, but Mammaro met with a child protective services worker from the Division. Mammaro sought a restraining order against Damon, and at the hearing, a Division caseworker told Mammaro that someone had made allegations against her of child neglect based on drug use. The caseworker threatened to separate Mammaro and D.M. unless she submitted to a drug test. Mammaro complied and tested positive for marijuana, admitting that she used a small amount of marijuana to calm herself after coming home from the hospital.

At the final restraining order hearing, the caseworker appeared again and demanded that Mammaro take another drug test. She complied and again tested positive, with the second test

showing a smaller level of marijuana than the first.  Following these drug tests, and based on allegations from Damon and Mammaro's brother-in-law that Mammaro had used drugs in front of D.M., the Division filed for temporary guardianship of D.M.

While the petition for temporary guardianship was pending, the Division placed Mammaro and D.M. in a safe house for victims of domestic violence.  There, Mammaro's interaction with D.M. was supervised by Division employees.  Sometime later, Mammaro notified the Division that she was unable to get an extension to stay in the house, but it failed to make arrangements for Mammaro to remain there.  Without Division approval, Mammaro then moved with D.M. to a private home.  When the Division learned that Mammaro was no longer in supervised housing, it had police remove D.M. from Mammaro's custody.

Mammaro challenged the removal in New Jersey Superior Court, and within a few days the Division returned D.M. to her and approved the new housing.  Ultimately, the Superior Court dismissed the petition for temporary guardianship and found that she had not abused or neglected D.M.

Mammaro thereafter filed a complaint in this District against numerous defendants, including the Division and five Division employees, raising claims for violation of her rights under the First, Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the U.S. Constitution and the New Jersey Civil Rights Act.  The

Division filed a motion to dismiss.  The District Court granted the motion in almost all other respects, but it denied the motion with respect to one claim against the caseworkers: a substantive due process claim for interfering with Mammaro's parental rights by temporarily removing D.M. from Mammaro's custody.  The Division argued that its employees were protected by qualified immunity, but the Court rejected that defense, concluding that Mammaro had adequately alleged a violation and that the right at issue was clearly established at the time of the alleged conduct.

The caseworkers appealed that decision, and the Third Circuit reversed the denial of the Division's motion with regard to qualified immunity.  The Third Circuit first set forth the law governing the second prong of the qualified immunity analysis:  "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  Mammaro, 814 F.3d at 169 (quoting al-Kidd, 563 U.S. at 735) (alterations and quotations omitted).  "In other words, there must be sufficient precedent at the time of action, factually similar to the plaintiff's allegations, to put defendant on notice that his or her conduct is constitutionally prohibited."  Id. (citation omitted).  A court first looks for applicable Supreme Court precedent, but even if none exists, it may be possible that a

12

"robust consensus of cases of persuasive authority" in the Court of Appeals could clearly establish a right for purposes of qualified immunity.  Id. (quoting Taylor v. Barkes, 575 U.S. 822, 135 S. Ct. 2042, 2044 (2015)) (other citation omitted).

The Third Circuit then recounted the alleged constitutional violations perpetrated by the caseworkers - that the caseworkers arbitrarily interfered with her substantive due process right to parent her child, and that they violated her right to be free from the temporary removal of her child because there was no "reasonable and articulable evidence giving rise to a reasonable suspicion that a child has been abused or is in imminent danger of abuse."  Id. (citing Croft v. Westmoreland Cty. Children & Youth Servs., 103 F.3d 1123, 1126 (3d Cir. 1997)).  More specifically, Mammaro contended that the caseworkers removed her child after she violated the restrictions in her contact with D.M. by removing the child from supervised housing, and at the time of the removal, there was insufficient evidence of past abuse or risk of future abuse by her to justify D.M.'s removal.  Id. at 169-70.

The Third Circuit found that even though the Supreme Court has recognized as a general matter that "the Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children," and from this fundamental right flows certain procedural due process rights for parents when the state seeks to

13

deprive them permanently of custody, "no Supreme Court precedent
clearly establishes that D.M.'s temporary removal from her
mother's custody violated substantive due process."  Id. at 170
(citations omitted).  The Third Circuit further found that
"assuming a consensus of persuasive authority could clearly
establish a right, there is no consensus that removing D.M. was an
unconstitutional interference with the parent-child relationship"
under the circumstances alleged in Mammaro's complaint.  Id.

The Third Circuit further explained,

> Mammaro's reliance on Croft to argue otherwise is
> misplaced. Putting aside the question of whether one case is
> sufficient to establish a "robust consensus of persuasive
> authority," Croft is factually off point.  There a caseworker
> followed up on a "six-fold hearsay report by an anonymous
> informant" of child abuse.  Croft, 103 F.3d at 1126.  After
> interviewing the father and his child, the caseworker
> uncovered no evidence of abuse, yet still threatened to
> remove the child that night.  Id. at 1124.  We recognized
> that child welfare agencies may be justified in removing a
> child when there are fears of abuse.  But before separating
> parent and child, caseworkers need "some reasonable and
> articulable evidence giving rise to a reasonable suspicion
> that a child has been abused or is in imminent danger of
> abuse."  Id.  We concluded that the caseworker lacked
> objectively reasonable evidence of abuse and that the
> separation of parent and child was an arbitrary abuse of
> government power.  Id. at 1127.

> We have much different facts than did Croft.  Mammaro's
> husband and brother-in-law had made an allegation of
> neglect that was supplemented by two positive drug tests of
> Mammaro.  And the immediate impetus for D.M.'s removal was
> Mammaro's decision to take D.M. from supervised housing, a
> factor not present in Croft.  While Mammaro does allege that
> the caseworkers failed to assist her in making new
> arrangements for approved housing, nothing in Croft suggests
> that the failure to assist her - however unfair and
> counterproductive it may have been - was an arbitrary abuse

of government power that shocks the conscience.
Accordingly, <u>Croft</u> did not put the caseworkers on notice that
their conduct violated substantive due process.

<u>Mammaro</u>, 814 F.3d at 170-71.

The allegations in <u>Mammaro</u> and those asserted by Plaintiffs
in this case are analogous, and they are similarly distinguishable
from the situation in <u>Croft</u>.  As summarized above, On June 6,
2017, DCPP received a phone call from her children's Early
Childhood Development Center School.  The caller told DCPP that
Flanders was upset and agitated when he dropped O'Bryant's
children off at school.  Upon further investigation, DCPP
discovered that Flanders, who was cohabitating with O'Bryant's two
children at the time, had a documented history of child abuse and
a violent criminal record, which included endangering the welfare
of a child, weapons, and aggravated assault on a police officer.

That same day, the defendant caseworkers came to O'Bryant's
home.  An investigation of the home revealed a bed bug and roach
infestation, the stove was not working, and the house was in need
of repairs.  It was also discovered that O'Bryant had either self-
mutilated ("cutting") or attempted suicide while pregnant due to
severe depression.  O'Bryant was hospitalized that day.

The next day, June 7, 2017, before she was discharged,
caseworkers told O'Bryant if she wanted to keep her children she
would have to agree to not allow Flanders near them until he had
finished domestic violence and parenting programs.  O'Bryant

signed a written contract agreeing to these terms, which she refers to as a Family Agreement. O'Bryant contends that she signed the agreement under duress.

The caseworkers brought O'Bryant home, and Flanders was there. O'Bryant contends that she and Flanders tried to explain that his child abuse case in Cumberland County involving one of his children, who did not live with O'Bryant and Flanders, had been resolved, but that the caseworker "knew nothing about this" and told Flanders that he must leave the house or she was going to call the police to make him leave. O'Bryant claims that a caseworker promised to help with the bed bug and roach infestation by hiring an exterminator and assist in fixing the stove, but that she never followed through.

A few days later, O'Bryant's two children went to Ohio for two months. On August 15, 2017 they returned home, and on August 16, 2017, O'Bryant gave birth to her and Flanders' daughter. The caseworkers came to the hospital on August 17, 2017 and asked Peoples to take O'Bryant's older two children home because Flanders was there, and according to the Family Agreement O'Bryant signed, he was not supposed to be around the children until after he completed the twelve-week domestic violence and parenting programs. O'Bryant and Flanders again explained to the caseworker that because the Cumberland County domestic violence case involving Flanders' son was closed in March, they did not

16

understand why Flanders was not permitted to be around O'Bryant's children.  The caseworker responded that they were required to follow the Family Agreement O'Bryant signed.

O'Bryant told the caseworkers she did not want to abide by the agreement and that she wanted DCPP out of her life.  When Peoples attempted to leave with the older children, the caseworkers called out to him that they wanted to speak with the children.  Peoples refused and Flanders came into the hallway. Camden County Sheriff deputies were called to bring the children across the street to the DCPP office so that DCPP caseworkers could speak with them, but Peoples demanded that they produce a warrant.  Peoples and Flanders walked with the caseworkers and two children across the street to the DCPP building, but the two adults were not permitted inside.  Plaintiffs claim that no paperwork was provided to them justifying the seizure of the children.[7]  Two hours later, a Camden County Sheriff's deputy "for some reason [] now has an arrest warrant for Mr. Flanders," and arrests him.  The next day, August 18, 2017, O'Bryant's baby was taken into DCPP custody.

---

[7] Despite this contention, Plaintiffs' complaint relates that O'Bryant was handed "the yellow paper (DODD) work."  (Docket No. 1 at 31.)  "A 'Dodd removal' refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82. The Act was authored by former Senate President Frank J. 'Pat' Dodd in 1974."  New Jersey Div. of Youth and Family Services v. P.W.R., 11 A.3d 844, 849 n.11 (N.J. 2011) (citation omitted).

A hearing on the custody status of O'Bryant's children was scheduled for August 18, 2017, but was postponed because O'Bryant was not able to attend for medical reasons.  It was rescheduled for October 5, 2017.  On October 2, 2017, Plaintiffs filed their instant suit alleging that the caseworkers violated their due process rights by arbitrarily interfering with their parental rights in a manner that shocks the conscience, and the child protective service caseworkers should have known that their actions violated those rights.

The DCPP defendants are entitled to qualified immunity for their actions alleged by Plaintiffs.  As the Third Circuit found in Mammaro, there is no Supreme Court precedent that clearly establishes O'Bryant's children's temporary removal from her custody violates substantive due process.  Moreover, as directly evidenced by the facts in Mammaro, there is no consensus in the case law that temporarily removing O'Bryant's children was an unconstitutional interference with the parent-child relationship[8] under the circumstances alleged in Plaintiffs' complaint.

Prior to the removal of O'Bryant's children from her custody on August 17 and 18, 2017, DCPP considered the following:

- The children's school reported to DCPP that Flanders was

_____

[8] The Court refers to Plaintiffs collectively, but notes that Peoples, as the children's grandfather, has not cited to any law that confers due process rights to a grandparent in the situation described by Plaintiffs.

upset and agitated when he dropped O'Bryant's children off at school.

- DCPP discovered that Flanders, who lived with O'Bryant and her two children, had a documented history of child abuse and a violent criminal record, which included endangering the welfare of a child, weapons, and aggravated assault on a police officer.

- DCPP discovered that O'Bryant's home had a bed bug and roach infestation, the stove was not working, and the house was in need of repairs.

- DCPP discovered O'Bryant had either self-mutilated or attempted suicide while pregnant due to severe depression, and that O'Bryant needed to be hospitalized.

- O'Bryant entered into a contract - or Family Agreement - whereby she agreed that in order to keep custody of her children Flanders would not live with her and her children until after Flanders completed parenting and domestic violence programs.

- When O'Bryant's children returned from Ohio two months later, DCPP was informed that they resumed living with O'Bryant and Flanders, and Flanders and O'Bryant's children were at the hospital together visiting O'Bryant and her and Flanders' new baby.

19

- Flanders had not completed the programs which were a condition under the Family Agreement to Flanders' return to the O'Bryant home.

In consideration of all of these facts and circumstances, it is evident that the caseworkers' actions did not constitute "an arbitrary abuse of government power that shocks the conscience." Mammaro, 814 F.3d at 170-71. Neither Croft nor Mammaro, nor any other case cited by Plaintiffs, shows that the caseworkers were put on notice that their conduct violated substantive due process.[9] Even though O'Bryant claims that she did not fully understand the impact of signing the Family Agreement, that DCPP never assisted her in correcting the conditions of her home, that it was illogical to Plaintiffs that Flanders could interact with his son at the conclusion of the Cumberland County child endangerment case but not O'Bryant's children, and there are systemic issues with the child protection services system in New Jersey, these factors do not outweigh the other factors listed above that compelled the DCPP to temporarily remove O'Bryant's children from her care. Indeed, "[c]aseworkers investigating allegations of child abuse often must make difficult decisions based on imperfect information. Particularly when deciding whether to separate parent and child, a caseworker must weigh the rights of the parent

---

[9] To the contrary, Mammaro would teach that the state defendants' actions were not violative of Plaintiffs' constitutional rights.

against the rights of the child and the risk of abuse. . . . [T]he failure to act quickly and decisively in these situations may have devastating consequences for vulnerable children." Mammaro, 814 F.3d at 171 (citations omitted).

Moreover, Plaintiffs filed this case before the New Jersey state family court opined in the first instance on the propriety of the children's removal.  And since that time, DCPP actively worked with O'Bryant to achieve reunification, with O'Bryant visiting her children daily while they were in DCPP custody, O'Bryant and Flanders are no longer in a relationship, and the children have been reunited with their mother.  As the Third Circuit stated in Mammaro, in order for Plaintiffs' "case to have legs," Plaintiffs "must show that the law was so well established at that time a reasonable caseworker would have understood that temporarily removing a child in those circumstances would violate substantive due process." Mammaro, 814 F.3d at 170-71. Plaintiffs have not done so.  The state defendants are entitled to qualified immunity and Plaintiffs' claims against them must be dismissed with prejudice.[10]

───────────────

[10] See Klingberg v. Hatcher, 2019 WL 1724197, at *5 n.6 (D.N.J. 2019) (citing Werkheiser v. Pocono Tp., 780 F.3d 172, 176 (3d Cir. 2015) (granting defendant's motion to dismiss, finding the defendant entitled to qualified immunity because the law defendant allegedly violated was not clearly established, and dismissing those claims against the defendant with prejudice); Cresci v. Aquino, 2017 WL 1356322, at *10 (D.N.J. 2017) (same); Barron v. New Jersey, 2018 WL 324725, at *3 (D.N.J. 2018) (same); Roth v.

**CONCLUSION**

 For the reasons set forth above, the motion of the state defendants to dismiss will be granted as their actions as pled are protected by the doctrine of qualified immunity.  An appropriate Order will be entered.


Date: <u>February 22, 2021 </u>    <u>    s/ Noel L. Hillman    </u>
At Camden, New Jersey    NOEL L. HILLMAN, U.S.D.J.

---

City of Hermitage, 709 F. App'x 733, 736 (3d Cir. 2017) (explaining that a court must assess a motion to dismiss based on qualified immunity so that it can be determined whether claims should be dismissed with prejudice prior to assessing other bases for dismissal which would only provide a dismissal without prejudice)).